IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DIANE G. BACA,

          Plaintiff,

        vs.                                  Civ. No. 19-456  JFR

ANDREW SAUL, Commissioner
of the Social Security Administration,

          Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 12)[2] filed July 30, 2019, in connection with Plaintiff's *Motion to Reverse and Remand for Rehearing With Supporting Memorandum,* filed December 2, 2019.  Doc.  21.  Defendant filed a Response on February 27, 2020.  Doc. 24.  And Plaintiff filed a Reply on March 26, 2020.  Doc. 27.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is not well taken and shall be **DENIED**.

### I.  Background and Procedural Record

Plaintiff Diane G. Baca (Ms. Baca) alleges that she became disabled on July 24, 2011, at the age of fifty-nine,[3] because of liver cirrhosis, hypertension, hypothyroidism, hepatitis C,

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 6, 9.)

[2]  Hereinafter, the Court's citations to Administrative Record (Doc. 12), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

[3]  Ms. Baca initially alleged an onset date of September 1, 2007, but amended her onset date to July 24, 2011, during her second Administrative Hearing held on November 6, 2018.  Tr. 622.

thrombocytopenia, UGI B, anemia and esophageal varices.  Tr. 195, 198, 622.  Ms. Baca completed the twelfth grade in 1970.  Tr. 199.  Ms. Baca worked for twenty-two years as an electronic assembler/drafter for Honeywell until she was laid off in 2005.  Tr. 199, 562, 581-82, 623.   In 2006 and 2007, she worked for BlueCross Blue Shield as a medical claims processor. Tr. 199, 209, 562.   In 2007, she started working for Renal Medical Associates as a medical records keeper.  Tr. 199, 210, 562.  In 2007, Ms. Baca stopped working because of her medical problems.  Tr. 199, 562.

On July 24, 2012, Ms. Baca protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*.  Tr. 185-86, 195.  State Agency medical consultant Leah Holly, D.O., reviewed the medical record evidence at the initial level of consideration and assessed that Ms. Baca could perform light exertional work-related physical activities with certain postural limitations due to fatigue.  Tr. 106-07.  State Agency psychological consultant Julian Lev, Ph.D., assessed that Ms. Baca's anxiety was nonsevere.  Tr. 104-05.  Because it was determined that Ms. Baca's conditions were not severe enough to keep her from working, Ms. Baca's application was denied at the initial level.  Tr. 97, 99-109, 123-26.

At reconsideration, State Agency medical consultant Karen Schnute, M.D., reviewed the medical record evidence and assessed that Ms. Baca could perform light exertional work-related physical activities with certain postural limitations due to fatigue.  Tr. 118-120.  State Agency psychological consultant Carol Mohney, Ph.D., assessed that Ms. Baca's anxiety was nonsevere. Tr. 116-17.  The Administration again found that Ms. Baca's conditions were not severe enough to keep her from working.  As such, Ms. Baca's application was denied at reconsideration.  Tr. 98, 110-122, 132-36.

Upon Ms. Baca's request, Administrative Law Judge (ALJ) Donna Montano held a hearing on October 2, 2014.  Tr. 64-95.  Ms. Baca appeared in person at the hearing with attorney representative Michael Armstrong.  *Id*.  On July 16, 2015, ALJ Montano issued an unfavorable decision.  Tr. 11-22.  On August 11, 2016, the Appeals Council issued its decision denying Ms. Baca's request for review and upholding the ALJ's final decision.  Tr. 1-5.  On October 12, 2016, Ms. Baca timely filed a Complaint seeking judicial review of the Commissioner's final decision.  *See* USDC NM Civ. No. 16-1128 KRS (Doc. 1).

Upon judicial review, on December 21, 2017, the Court reversed the Commissioner's decision and remanded Ms. Baca's claim to the Commissioner to conduct further proceedings.[4] Tr. 679-684.  On November 6, 2018, ALJ Lillian Richter conducted a second Administrative Hearing.  Tr. 618-49.   Ms. Baca appeared at the hearing with attorney representative Laura Johnson.  *Id.*  The ALJ took testimony from Ms. Baca and from impartial vocational expert (VE) Karen Provine.  *Id.*  On March 18, 2019, ALJ Richter issued an unfavorable decision.  Tr. 596-611.  Because this case had already been remanded following judicial review, Ms. Baca timely filed the instant action, rather than requesting review by the Appeals Council, as permitted by 20 C.F.R. § 404.984(d).  Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[4] The Court remanded having determined that ALJ Montano had failed to provide specific findings supported by evidence in discounting the opinion of consultative examiner John R. Vigil, M.D.  Tr. 682-84.

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income

disability benefits for adult individuals).  The Social Security Commissioner has adopted the

familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria

as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.  *Id.*  Gainful work activity is work activity that you do for pay or profit.  20 C.F.R. §§ 404.1572(b).

showing, the claimant is deemed disabled. If, however, the Commissioner is
able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431

F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The

claimant has the initial burden of establishing a disability in the first four steps of this analysis.

*Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987).

The burden shifts to the Commissioner at step five to show that the claimant is capable of

performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not

disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v.

Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**     **Standard of Review**

The Court reviews the Commissioner's decision to determine whether the factual

findings are supported by substantial evidence in the record and whether the correct legal

standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir.

2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on

substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might

accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not

based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,*

373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371,

1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of

evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the

[ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient

particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision

must "provide this court with a sufficient basis to determine that appropriate legal principles

have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the

agency.  *Langley*, 373 F.3d at 1118.

### III.  <u>Analysis</u>

The ALJ made her decision that Ms. Baca was not disabled at step four of the sequential

evaluation.  Tr. 610.  The ALJ determined that Ms. Baca met the insured status requirements of

the Social Security Act through December 31, 2012 (Tr. 601), and that she had not engaged in

substantial gainful activity from her alleged onset date of July 24, 2011, through her date last

insured.  Tr. 601.  She found that Ms. Baca had severe impairments of anxiety, depression,

insomnia, cirrhosis, arthralgias, chronic fatigue, cloudy posterior capsule, osteoarthritis, and

obesity.  Tr. 601.   She also found that Ms. Baca had nonsevere impairments of osteopenia,

vitamin D deficiency, hepatitis C, hypothyroidism, cataracts, hypertension, thrombocytopenia,

and iron deficiency anemia.  Tr. 602.  The ALJ determined, however, that Ms. Baca's

impairments did not meet or equal in severity any of the listings described in the governing

regulations, 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 602-605.  Accordingly, the ALJ

proceeded to step four and found that Ms. Baca had the residual functional capacity to perform

light work as defined in 20 C.F.R. § 404.1567(b), but that she could

> occasionally stoop, kneel, crouch and crawl.  She can occasionally climb ramps
> and stairs.  She can never climb ladders, ropes or scaffolds.  She can never
> balance.  The claimant should avoid exposure to unprotected heights and
> hazardous machinery and cannot operate a motor vehicle at night.  The claimant
> can perform detailed but not complex work.

605.  The ALJ noted that "[i]n limiting the claimant to no balancing, my intention was to

determine whether occupations existed that would not require the claimant to balance.  This

limitation does not mean, nor does the record support, that the claimant is unable to maintain

sufficient body equilibrium to sit, stand or walk on level ground." Tr. 605, fn. 1.  The ALJ

concluded at step four that Ms. Baca would be able to perform her past relevant work as an

electronics assembler and was, therefore, not disabled.  Tr. 610.

In support of her Motion, Ms. Baca argues that the ALJ, having assessed several "fatigue

inducing" nonsevere impairments at step two of her analysis, failed to properly discuss and

account for their combined effect with Ms. Baca's medically determinable severe impairment of

chronic fatigue when she made her RFC assessment at step four.  Doc. 21 at 8-12.  In particular,

Ms. Baca argues that the ALJ failed to properly consider Ms. Baca's statements regarding the

intensity, persistence and limiting effects of her fatigue pursuant to SSR 16-3p and *Luna v.

Bowen*, 834 F.2d 161, 163 (10th Cir. 1987).  *Id.*  She further argues that the ALJ failed to

adequately address Ms. Baca's nonsevere impairments at step four of her analysis pursuant to

SSR 96-8p and *Wells v. Colvin*, 727 F.3d 1061, 1068-69 (10th Cir. 2013).  For these reasons,

Ms. Baca asserts the ALJ's RFC is not supported by substantial evidence and contrary to law

pursuant to relevant regulations and Tenth Circuit case law.  Doc. 21 at 8-12.

The Commissioner contends that there were no additional limitations stemming from

Ms. Baca's nonsevere impairments that warranted a revised RFC.  Doc. 24 at 7-8.  The

Commissioner further contends that substantial evidence supports the ALJ's determination that

Ms. Baca's allegations of disabling symptoms were not entirely consistent with other evidence in

the record and, therefore, reasonably discounted them.  *Id.* at 8-11.

### A.    Relevant Medical Evidence

Ms. Baca's alleged onset date, as amended, is July 24, 2011.  Tr. 622.  Her date of last

insured is December 31, 2012.  Therefore, to receive benefits, Ms. Baca must show she was

disabled prior to her date of last insured. *See Potter v. Sec'y of Health & Human Servs.*, 905
F.2d 1346, 1347 (10th Cir. 1990).

    1.    <u>**2007**</u>

     Ms. Baca saw Joseph Gorvetzian, M.D., of Albuquerque Health Partners, four times in
2007. Tr. 295-301. She was being followed for a hepatitis C diagnosis. *Id.* On February 13,
2007, Ms. Baca reported "doing okay" and "no new problems." Tr. 301. She also reported
starting a new job at Blue Cross Blue Shield, but that she found it somewhat stressful. *Id.* On
physical exam Dr. Gorvetzian noted, *inter alia,* blood pressure of 118/74 and that she was alert
and in no distress. *Id.*

     On April 25, 2007, Ms. Baca presented with her husband for the appointment to discuss
her hepatitis C diagnosis, routes of acquisitions, risk of transmission, and her treatment options.
Tr. 299. She reported she had been "feeling well." *Id.*

     On July 26, 2007, Ms. Baca reported that she was going to school and then working, but
had not been working recently. Tr. 297. She complained of fatigue. *Id.* On physical exam
Dr. Gorvetzian noted, *inter alia,* blood pressure of 112/66 and that she was alert and in no
distress. *Id.* Dr. Gorvetzian also noted medications of Lisinopril (high blood pressure),
Levothroid (hypothyroidism), and Protonix (GERD). *Id.* Ms. Baca expressed an interest in
pursuing treatment for hepatitis C. *Id.*

     On October 18, 2007, Ms. Baca reported she was doing well. Tr. 295. She also reported
that she was giving herself treatment shots on Mondays which caused some anxiety that affected
her sleep later in the week, but other than that no complaints. *Id.* On physical exam
Dr. Gorvetzian noted, *inter alia,* blood pressure of 116/78 and that she was alert and in no

distress.  *Id.*  Dr. Gorvetzian also noted that recent laboratory studies and renal function tests

were normal, except for a low white cell count.  *Id.*

> ### 2.   <u>2008</u>

Ms. Baca saw Dr. Gorvetzian twice in 2008.  On January 14, 2008, she reported that

overall she was doing well, although she was having some problems sleeping.  Tr. 293-94.  She

also reported that she was doing work around the house and was fairly active during the day, but

then got tired towards the end of the day.  *Id.*  On physical exam Dr. Gorvetzian noted, *inter alia,*

blood pressure of 118/68 and that she was alert and in no distress.  *Id.*  Dr. Gorvetzian also noted

that Ms. Baca's anxiety and insomnia were stable.  *Id.*

On February 18, 2008, Ms. Baca reported that she was doing well and felt a lot better

than when she started treatment.  Tr. 291-92.  Ms. Baca also reported that her problems with

insomnia had gotten better.  *Id.*  On physical exam Dr. Gorvetzian noted, *inter alia,* blood

pressure of 116/74 and that she was alert and in no distress.  *Id.*  Dr. Gorvetzian further noted

that laboratory studies indicated a white count of 1.6, and that she had "an undetectable hepatitis

C viral load."

> ### 3.   <u>2009</u>

On May 15, 2009, Ms. Baca had a bone density study.  Tr. 284-90.  Jeremy M. Gleeson,

M.D., diagnosed low bone mass (osteopenia) "entirely consistent with aging."  Tr. 284.  He

recommended adequate calcium and Vitamin D intake and encouraged weightbearing exercise of

at least 20 minutes three days a week, if possible.  *Id.*  He noted there was no apparent indication

for bone related pharmacologic therapy and that Ms. Baca consider a follow-up bone mineral

density testing in 3-5 years.  *Id.*

9

4.    **2010**

a.    **Allison M. Held, M.D.**

On May 6, 2010, Ms. Baca presented to Presbyterian Medical Group in Rio Rancho to establish primary care with Allison M. Held, M.D.  Tr. 346, 349.  Ms. Baca wanted to discuss losing weight and complained of fatigue.  *Id.*  She also reported that she had not had labs or her TSH checked in two years and needed her medications refilled.  *Id.*  Ms. Baca reported trying to walk for weight loss.  *Id.*  Ms. Baca's blood pressure was noted to be 125/82.  Tr. 349.

On August 26, 2010, Ms. Baca returned for follow up on lab work and Dr. Held told her that her platelets were low, but that otherwise the results of her lab work were within normal limits.  Tr. 348.  Ms. Baca reported that she easily bruised, suffered fatigue, and had joint aches in her fingers and toes.  *Id.*  Blood pressure was noted to be 125/76.  *Id.*

b.    **Kathryn Faccini, M.D.**

On December 30, 2010. Ms. Baca saw Hematologist Kathryn Faccini, M.D., on a referral from Dr. Held.  Tr. 354-55.  Ms. Baca reported thrombocytopenia (low platelets) since 2008.  *Id.* Dr. Faccini performed a laboratory evaluation and noted that Ms. Baca's platelets, *inter alia*, were normal.  *Id.*  Dr. Faccini assessed that Ms. Baca had mild, asymptomatic thrombocytopenia. *Id.*  She recommended that Ms. Baca cease her alcohol usage and ordered additional laboratory studies.  *Id.*  Dr. Faccini instructed Ms. Baca to follow up in one month to review the results.  *Id.*

5.    **2011**

a.    **Kathryn Faccini, M.D.**

Ms. Baca saw Dr. Faccini twice in 2011.  Tr. 352-53, 381.  On January 24, 2011, Dr. Faccini informed Ms. Baca that the recent laboratory work indicated no evidence of autoimmune, lupus-like inhibitor, iron, or B12 abnormalities.  Tr. 352.  Dr. Faccini suggested

monitoring Ms. Baca's blood count every two months and that Ms. Baca was to return in six months.  *Id.*

On July 25, 2011, Ms. Baca returned to see Dr. Faccini who indicated that Ms. Baca was clinically stable.  Tr. 381.

### b.    Michele Hannagan, D.O.

On July 26, 2011, Ms. Baca presented to Michele Hannagan, D.O., at Rio Rancho Family Practice to establish care.  Tr. 307-19.  Ms. Baca was concerned that her thyroid medication needed to be adjusted because she had been more fatigued and gained weight since the last adjustment a year ago.  Tr. 315.  Ms. Baca was also concerned about thickening in her neck and wondered if her goiter was returning.  *Id.*  Ms. Baca reported that her blood pressure was stable and well controlled.  *Id.*  Ms. Baca also reported a recent diagnosis of cataracts.  *Id.*  On physical exam, Dr. Hannagan noted, *inter alia*, normal vital signs, normal range of motion (musculoskeletal and neck), normal gait, normal mood and affect, and normal cognition and memory.  Tr. 318.  Dr. Hannagan planned to do fasting labs and recommended that Ms. Baca see an eye care specialist for her cataracts.  *Id.*

On September 5, 2011, Dr. Hannagan updated the July 26, 2011, record and indicated that "labs reviewed and TSH low with T4 high.  Will decrease Levothyroxine to 0.005mg daily and have pt. recheck levels in 6 weeks."  Tr. 318.

### 6.    2012

### a.    Michele Hannagan, D.O.

Ms. Baca saw Dr. Hannagan three times in 2012.  On January 4, 2012, Ms. Baca reported that her blood pressure was not as well-controlled as in the past, and that she had not noticed any changes since her thyroid medication had been adjusted.  Tr. 324.  Ms. Baca also complained of

fatigue, but believed it had to do with her busy lifestyle. *Id.* On physical exam, Dr. Hannagan noted, *inter alia*, vital signs reviewed, normal range of motion and no pain (musculoskeletal, neck, and lumbar back), normal mood and affect, and normal cognition and memory. Tr. 326. Dr. Hannagan increased Ms. Baca's blood pressure medication and instructed Ms. Baca to keep a "BP log." Tr. 327. Dr. Hannagan also instructed Ms. Baca to continue her thyroid medication at its current dose. *Id.* Dr. Hannagan recommended that Ms. Baca take calcium two to three times daily. *Id.*

On May 25, 2012, Ms. Baca reported that she started but discontinued the increased dose of her blood pressure medication after two weeks because she began having trouble sleeping and thought the increased dosage was the cause of her difficulty sleeping. Tr. 337. Her difficulty sleeping, however, did not go away, and Ms. Baca also reported that "there is quite a bit of stress in her life right now since her family has begun a home business and there is a lot of financial stress and arguing." *Id.* Ms. Baca says she cannot stop worrying about things and therefore cannot sleep. *Id.* On physical exam, Dr. Hannagan noted, *inter alia*, vital signs reviewed, normal range of motion (musculoskeletal and neck), normal mood and affect, and normal cognition and memory. Tr. 338. Dr. Hannagan prescribed Celexa (antidepressant) and Ativan (antianxiety) as needed, and ordered laboratory studies. Tr. 339.

On December 21, 2012, Ms. Baca reported to Dr. Hannagan that her blood pressure remained in control. Tr. 469. She also reported she has known gallbladder disease and that her GI physician was trying to see if Ms. Baca could manage it with diet alone. *Id.* Ms. Baca stated that she had been doing okay, but if she does not follow her diet she gets right upper quadrant pain. *Id.* Ms. Baca also reported having trouble with short-term memory and staying on task, and that her osteoarthritis in her back made it difficult for her to sit still for long periods of time.

12

*Id.* Dr. Hannagan noted that Ms. Baca was seeking disability and asked her to complete paperwork which turned out to be a functional capacity evaluation. *Id.* On physical exam, Dr. Hannagan noted, *inter alia*, vital signs reviewed, normal range of motion and no pain (neck), normal range of motion (musculoskeletal), normal mood and affect, and normal cognition and memory. Tr. 466-67. Dr. Hannagan planned to do fasting lab work. Tr. 470. She refilled Ms. Baca's prescription for Levothyroxine and instructed Ms. Baca to continue with present medications and specialty care. *Id.* Dr. Hannagan informed Ms. Baca that she could not perform a functional capacity evaluation for her disability application, but could make a referral to physical therapy/occupational therapy and explained the difficulties in getting that kind of exam completed. *Id.* Dr. Hannagan told Ms. Baca that her memory issues may have to do with her cirrhosis, but her "ammonia level is not elevated and thereby it is difficult to make that connection." *Id.* Dr. Hannagan offered to refer Ms. Baca to Neurology to determine any issues with memory whose etiology could be identified. *Id.*

### b.   <u>Presbyterian Hospital</u>

On July 18, 2012, Ms. Baca was referred to Presbyterian Hospital for "low hemoglobin." Tr. 387. The admitting diagnosis was "[a]cute-on-chronic anemia with a history of iron deficiency, positive guaiac examination, and possible gastrointestinal bleed." *Id.* A gastroenterology consult was ordered and Ms. Baca was evaluated by Paul E. Pierce, M.D. Tr. 389-90. Ms. Baca reported to Dr. Pierce that lab studies obtained by Dr. Hannagan demonstrated anemia with an elevated RDW suggestive of iron deficiency and that Dr. Hannagan had begun treatment with iron replacement therapy and recommended follow up with a gastroenterologist. Tr. 389. Repeat lab work performed on July 17, 2012, indicated Ms. Baca to be more profoundly anemic and Dr. Hannagan's office recommended she come to the hospital for treatment. Tr. 389.

13

Ms. Baca reported to Dr. Pierce, *inter alia*, an increase of weakness and fatigue over the past several months, controlled hypertension, no significant arthritis, replacement therapy for hypothyroidism, and post cataract extraction. Tr. 389-390. Ms. Baca reported having been under a great deal of stress recently and having difficulty with anxiety as well as difficulty sleeping. Tr. 390. On physical exam, Dr. Pierce noted, *inter alia*, that Ms. Baca was pale and that her blood pressure was 105/49. Tr. 390. Dr. Pierce assessed iron deficiency anemia, presumably related to subacute gastrointestinal blood loss and planned to do endoscopic studies. Tr. 391.

> The summary of Ms. Baca's hospital admission is as follows:
>
> [T]his is a 50 [sic] year-old-female who suffers from chronic anemia with a diagnosis of iron deficiency anemia and a chronic history of hepatitis C. The patient was referred by the hematologist because of low hemoglobin for further evaluation and management. The initial hemoglobin showed hemoglobin of 7.1 and hematocrit of 22. The patient underwent blood transfusion, and GI consult was done with Dr. Pierce. EGD was performed with findings of esophageal varices. [Dr. Pierce] attempted to do esophageal banding, but this was not completed because of hematoma formation above the initial banding that was performed. The plan is to repeat the EGD after one to two weeks post-discharge. A colonoscopy was also performed, and there were no abnormal findings except for mild diverticulosis without diverticulitis. In order to further evaluate the liver as well as the gastrointestinal tract, Dr. Pierce requested for CT enterography, and the result is as mentioned in the studies performed. On the fourth hospital day, the patient remained stable. Hemoglobin and hematocrit were also stable after the blood transfusion. There was no active bleeding noted, and the decision was to discharge the patient home.

Tr. 387-88. Ms. Baca was discharged on July 21, 2012. *Id.* Ms. Baca was instructed to follow up with Dr. Pierce for EGD within one to two weeks, and to follow up with her primary care physician within one to two weeks to review her medications and for medication refills. *Id.*

### c.   **Dr. Kathryn Faccini**

On July 25, 2012, Ms. Baca saw Dr. Faccini for continued evaluation of thrombocytopenia associated with hepatitis C. Tr. 362-75. Ms. Baca discussed her recent

hospitalization and reported, *inter alia*, that she was tolerating oral iron fairly well.  Tr. 370.

Ms. Baca reported she had not been aware of any obvious bleeding prior to her admission.  *Id.*

Dr. Faccini noted that Ms. Baca had recently started on Celexa which has been reported to

contribute to bleeding.  *Id.*  Dr. Faccini reviewed recent data and noted that platelets "have been

normal, and hemoglobin on the 19th was up 9 grams."  *Id.*  On physical exam, Dr. Faccini noted,

*inter alia*, that Ms. Baca was pale and that she was ambulating normally.  *Id.*  She indicated

Ms. Baca's blood pressure was 113/66.  *Id.*  Dr. Faccini noted

> mild asymptomatic thrombocytopenia that is variable and has improved.  She
> does have severe iron deficiency as well as evidence of cirrhosis with varices.
> Hep C was successfully treated and therefore it is unclear to me if the cirrhosis is
> related to the past infection or another cause.  Her glucose has been noted to be
> elevated and I do not know if this has been addressed.  Other possible issues such
> as VwD and or Celexa induced bleeding have not been reviewed as yet.  She is
> clinically stable, although will be monitored closely with lab evaluation.

Tr. 370.  Dr. Faccini planned to repeat laboratory studies and to monitor Ms. Baca's hemoglobin

and iron status.  *Id.*

On August 16, 2012, Dr. Faccini instructed that disability paperwork she received be

returned to Ms. Baca explaining "this needs to go to her primary.  I see her for iron def – won't

qualify for disability."  Tr. 486.

On September 4, 2012, Ms. Baca presented to Dr. Faccini for continued evaluation of

thrombocytopenia associated with known positive hepatitis C/cirrhosis.  Tr. 373-80.  Ms. Baca

reported that she was tolerating the iron therapy well and denied any acute complaints.  Tr. 379.

Dr. Faccini indicated they reviewed all of the recent laboratory data and that copies had been

provided.  *Id.*  Dr. Faccini noted a mild elevation in liver enzymes and recommended Ms. Baca

change from Protonix to Prilosec.  *Id.*  Dr. Faccini also noted that Ms. Baca's hemoglobin had

not changed and that her iron studies were improving.  *Id.*  Dr. Faccini indicated that Ms. Baca

was clinically stable and she would continue to monitor her lab evaluations.  *Id.*

### d.     <u>Eye Associates</u>

On June 6, 2012, Ms. Baca had cataract surgery on her left eye.  Tr. 436-447.  On

October 10, 2012, Ms. Baca had cataract surgery on her right eye.  Tr. 411-16.

### 7.     <u>2013</u>

### a.     <u>Michele Hannagan, D.O.</u>

On February 3, 2013, Dr. Hannagan instructed staff to call Ms. Baca and let her know

that her "Vitamin D and thyroid are normal," and liver function tests were not elevated.  Tr. 591.

On April 24, 2013, Ms. Baca saw Dr. Hannagan and reported she was doing well, her

blood pressure was stable, and that she was stable on her diet regimen and having less

gallbladder attacks.  Tr. 805.  Ms. Baca was negative for fatigue.  Tr. 806.  On physical exam

Dr. Hannagan noted normal vital signs, normal range of motion without pain (neck), normal

range of motion (musculoskeletal), normal mood and affect, and normal cognition and memory.

Tr. 807.

On October 2, 2013, Ms. Baca saw Dr. Hannagan and reported her blood pressure was in

good control and that she continued to be fatigued.  Tr. 821-24.  On physical exam,

Dr. Hannagan noted vitals reviewed, normal range of motion without pain (neck), normal range

of motion (musculoskeletal), normal mood and affect, and normal cognition and memory.  Tr.

822-23.  Dr. Hannagan planned to continue current medications as prescribed; *i.e.,* blood

pressure medication, thyroid medication, Vitamin D supplement, and iron supplement.  Tr. 823.

b.     <u>**Paul E. Pierce, M.D.**</u>

On February 20, 2013, Ms. Baca presented to Dr. Pierce for follow up.  Tr. 797.  She reported occasional twinges of discomfort over the right upper quadrant, but was otherwise relatively stable with regard to hepatitis C and cirrhosis.  *Id.*  Ms. Baca complained of fatigue. *Id.*  Dr. Pierce assessed, *inter alia*, a history of hepatitis C with undetectable viral load and normal liver function tests; cirrhosis secondary to hepatitis C; cholelithiasis, asymptomatic; and history of iron deficiency anemia with negative GI workup.  Tr. 798.  Dr. Pierce noted that Ms. Baca was applying for disability and asked him to complete forms on her behalf.  *Id.*  He told her he would review them.[6]  *Id.*

On May 23, 2013, Ms. Baca presented for a routine follow-visit.  Tr. 810.  She reported being stable and that her major symptom was that of mild chronic fatigue.  *Id.*  Dr. Pierce reviewed laboratory studies from January 19 that indicated mild anemia and thrombocytopenia, and a normal hepatic function panel.  *Id.*

On October 22, 2013, Ms. Baca presented to Dr. Pierce complaining of flu-like illness. Tr. 830-38.  Dr. Pierce was concerned about a recent slight drop in Ms. Baca's blood count and wanted to perform a repeat esophagogastroduodenoscopy with possible variceal ligation.  Tr. 832.  Dr. Pierce was also concerned, given Ms. Baca's symptoms, that she might be experiencing symptomatic cholelithiasis.  *Id.*  Dr. Pierce discussed referring Ms. Baca to surgeons.  *Id.* Ms. Baca stated, as to both procedures, that she preferred to wait until after the holidays and would return in three months.  *Id.*

---

[6] The Administrative Record does not contain a functional capacity assessment completed by Dr. Pierce.

c.     **Juhee Sidhu, M.D.**

On April 3, 2013, Ms. Baca presented to Juhee Sidhu, M.D., for follow up of her thrombocytopenia.  Tr. 799-804.  Ms. Baca reported "feeling well."  Tr. 799.  She also reported fatigue.  Tr. 800.  On physical exam, Dr. Sidhu noted, *inter alia*, no distress, normal range of motion with no tenderness (neck and musculoskeletal), and normal mood and affect.  Tr. 800-01.  Dr. Sidhu assessed mild asymptomatic thrombocytopenia that is variable and asymptomatic and anemia resolved.  Tr. 803.  Dr. Sidhu indicated that Ms. Baca was clinically stable.  *Id.*

On July 3, 2013, Ms. Baca presented to Dr. Sidhu for follow up of her thrombocytopenia.  Tr. 816-820.  Ms. Baca reported "feeling well" and denied any acute complaints.  Tr. 816.  On physical exam, Dr. Sidhu noted, *inter alia*, no distress, normal range of motion with no edema or tenderness (neck and musculoskeletal), and normal mood and affect.  Tr. 817-18.

On October 9, 2013, Ms. Baca presented to Dr. Sidhu for follow up of her thrombocytopenia.  Tr. 825-29.  Ms. Baca reported she "feels well overall" and denied any excessive bleeding or bruising.  Tr. 825.  On physical exam, Dr. Sidhu noted, *inter alia*, no distress, normal range of motion with no edema or tenderness (neck and musculoskeletal), and normal mood and affect.  Tr. 817-18.

B.     **Function Report**

On August 19, 2012, Ms. Baca completed a Function Report.  Tr. 214-221.  Therein, she reported that on good and average days, she spends two to three hours cleaning and doing laundry, will prepare meals and straighten the kitchen, waters outside, watches television and reads.  Tr. 214, 218.  She reports being able to care for her pets, take them to the vet as needed, and take them to the groomers.  Tr. 215.  She reports going outside for at least one-half hour daily, that she is able to drive during the day, that she is able to shop in stores and by computer,

and is able to handle money.  Tr. 217.   Ms. Baca reported that she spends time with her family, takes her grandchildren to the zoo and other activities, goes out to eat, and attends church and social events.  Tr. 218.  Ms. Baca reported that she can lift twenty pounds and can "walk and stair climbing @ 2 blocks."  Tr. 219.  Ms. Baca reported she can follow written instructions but has to re-read them to remember, and must write down spoken instructions.  *Id.*  Ms. Baca reported that she has a hard time retaining new information.  Tr. 221.

      **C.**    **Testimony**

      On November 6, 2018, Ms. Baca testified that she was starting to get sick around the time she was laid off from Honeywell in 2005.  Tr. 623.  She testified that she was diagnosed with hepatitis C in 2005, was getting very tired, and had a hard time thinking straight, concentrating, and getting up in the morning.  *Id.*  She also noticed that her legs started to get tired and she had difficulty walking and climbing stairs, and that her legs ached at the end of the day.  Tr. 625. Ms. Baca testified she has had difficulty sleeping since she worked at Honeywell and gets about four hours of sleep at a stretch.  Tr. 628.  Ms. Baca testified that her difficulty with remembering, concentrating, and learning new things made it difficult to change careers after she was laid off from Honeywell.  Tr. 630.

      Ms. Baca testified the hepatitis C ultimately led to thrombocytopenia, cirrhosis of the liver, esophageal varices, and anemia.  Tr. 625.  She testified that the thrombocytopenia makes her very tired and that she bruises easily and has to be careful not to get a bad cut.  *Id.*  Ms. Baca testified that medications make her dizzy, tired and sleepy, but that she can't sleep.  Tr. 627. Ms. Baca testified that she has gallbladder-related attacks about once a week.  Tr. 628*.* She testified that she has back pain, and pain all over her body that flares up once or twice a week, and that she can't bend down and has difficulty showering and getting dressed.  Tr. 629.

19

Ms. Baca testified her husband, daughter and granddaughter help her with chores around the house.  Tr. 635.  She testified she can lift five or ten pounds.  *Id.*  Ms. Baca testified she can walk a block or two, and has difficulty with bending, squatting and kneeling.  Tr. 636*.*  She testified she exercises by walking in place and lifting two-pound weights.  *Id.*  Ms. Baca testified she could not go back to work because she would have to get up and be somewhere at a certain time, which she does not think she could do because of not sleeping well and aching when she wakes up in the morning.  Tr. 638.  She testified she has lots of doctor appointments.  *Id.*  Ms. Baca testified that she manages the family's finances and has read books for making a budget and spreadsheet.  Tr. 644.

### D.     The ALJ Properly Considered Ms. Baca's Nonsevere Impairments in Her RFC Analysis

Assessing a claimant's RFC is an administrative determination left solely to the Commissioner "based on the entire case record, including objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (an individual's RFC is an administrative finding)[7].  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R.

---

[7] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017.  82 Fed. Reg. 5844, 5845, 5867, 5869.

§§ 404.1545(a)(2) and (3).  The ALJ must consider and address medical source opinions and give good reasons for the weight accorded to a treating physician's opinion.  20 C.F.R. § 404.1527(b)[8]; SSR 96-8p, 1996 WL 374184, at *7.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.   Further, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7).  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion with citations to specific medical facts and nonmedical evidence, the court will conclude that his RFC assessment is not supported by substantial evidence.  *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review.  *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003) (unpublished).

### 1.   SSR 16-3p and *Luna v. Bowen*

Ms. Baca contends that she has a long history of "fatigue-inducing" severe and nonsevere impairments and that the ALJ failed to properly consider Ms. Baca's statements regarding the intensity, persistence and limiting effects of her fatigue pursuant to SSR 16-3p and *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987), in making her RFC determination.  Doc. 21 at 8-10.  SSR 16-3p provides instruction on the evaluation of a claimant's statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims.  SSR 16-3p, 2017 WL 5180304, at *1.  The ruling states in pertinent part that

> [u]nder our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability. However, if an individual alleges impairment-related symptoms, we must

_____

[8] The rules in this section apply for claims filed *before* March 27, 2017.  20 C.F.R. § 404.1527.

evaluate those symptom using a two-step process set forth in our regulations.
[Citing 20 C.F.R. §404.1529.]

First, we consider whether there is an underlying medically determinable physical
or mental impairment(s) that could reasonably be expected to produce an
individual's symptoms, such as pain.  Second, once an underlying physical or
mental impairment(s) that could reasonably be expected to produce an
individual's symptoms is established, we evaluate the intensity and persistence of
those symptoms to determine the extent to which the symptoms limit an
individual's ability to perform work-related activities for an adult[.]

*Id.* at *2-3.  The ruling goes on to state that "[w]e must consider whether an individual's

statements about the intensity, persistence, and limiting effects of his or her symptoms are

consistent with the medical signs and laboratory findings of record."  *Id.* at *5.  In addition to

using all of the medical and statement evidence, an ALJ will use factors set forth in 20 C.F.R.

1529(c)(3) that include:

1.    Daily activities;

2.    The location, duration, frequency, and intensity of pain or other
      symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication an
      individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, an individual receives or has received
      for relief of pain or other symptoms;

6.    Any measures other than treatment an individual uses or has used to
      relieve pain or other symptoms (e.g., lying flat on his or her back, standing
      for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning an individual's functional limitations and
      restrictions due to pain or other symptoms.

*Id.* at *8.  The ruling states that

If an individual's statements about the intensity, persistence, and limiting effects
of symptoms are consistent with the objective medical evidence and the other
evidence of record, we will determine that the individual's symptoms are more

22

likely to reduce his or her capacities to perform work-related activities[.] . . .  In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities[.]

*Id.*[9]

*Luna* sets forth a three-step analysis of subjective symptoms to determine whether objective medical evidence demonstrates the existence of a pain- or other symptom-producing impairment.  In lockstep with SSR 16-3p, *Luna* provides that before an ALJ need even consider any subjective evidence of pain or other symptoms, the claimant must first provide by objective medical evidence the existence of symptoms that could reasonably be expected to produce the alleged disabling symptoms.  *Luna*, 834 F.2d at 163.  If a claimant does so, the ALJ must then consider whether there is a "loose nexus" between the proven impairment and the subjective complaints.  *Id.* at 164.  If there is a loose nexus, the ALJ considers all of the evidence, both objective and subjective, to determine whether the subjective symptoms are disabling.  *Id.* at 165. Even if they are not, they are still nonexertional impairments to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's symptoms are insignificant.  *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and

---

[9] SSR 14-1p – *Evaluating Claims Involving Chronic Fatigue Syndrome* - provides that for those impairments that do not meet or equal the severity of a listing, "we must make an assessment of the person's RFC. . . .  In assessing RFC, we must consider all of the person's impairment-related symptoms in deciding how such symptoms may affect functional capacities.  The RFC assessment must be based on all the relevant evidence in the record."  SSR 14-1p, 2014 WL 1371245, at *8.

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."
*Id.*; *see also* SSR 16-3p, 2017 WL 5180304, at *10 ("it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not ) supported or consistent.' ").  Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth specific evidence he relies on in evaluating the claimant's credibility." *Poppa*, 569 F.3d at 1171 (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)); *see also Thompson*, 987 F.2d at 1490 (no "talismanic requirement that each factor . . . be addressed").

The ALJ considered Ms. Baca's statements regarding her alleged symptoms of fatigue in accordance with 16-3p and *Luna*.[10]  First, the ALJ determined that Ms. Baca's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  Tr. 606. Second, she considered all of the evidence, both objective and subjective, to determine the extent to which the Ms. Baca's alleged symptom of fatigue limited Ms. Baca's ability to perform work-related activities.  Tr.  605-609.  In so doing, the ALJ considered Ms. Baca's statements concerning the intensity, persistence and limiting effects of her alleged symptoms and whether they were consistent with the medical evidence and other evidence in the record.  *Id.*  And contrary to Ms. Baca's argument that the ALJ only recited boilerplate language to support her determination, the ALJ discussed the medical evidence, Ms. Baca's function report, and Ms. Baca's testimony, and provided several examples of inconsistencies between Ms. Baca's

---

[10] The ALJ did not specifically cite *Luna v. Bowen*.  However, the required analysis set forth in *Luna* is sufficiently captured in SSR 16-3p. Tr. 605.  At step four, the ALJ explicitly stated that in making her RFC finding that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and SSR 16-3p." Tr. 605.

statements regarding her alleged symptoms and the medical record evidence. *Id.* As such, the

ALJ's findings are closely and affirmatively linked to substantial evidence.

For instance, the ALJ discussed that Ms. Baca testified that low platelets, or

thrombocytopenia, caused fatigue, but that medical record evidence demonstrated that her

thrombocytopenia was considered mild and asymptomatic. Tr. 605, 607. The record supports

this finding. Tr. 355, 370, 379. The ALJ discussed that Ms. Baca testified she has pain flare ups

throughout her body once or twice a week, but that the longitudinal medical record evidence

demonstrated only intermittent arthralgia pain, that Ms. Baca denied any significant arthritis in

2012, and that she chose not to pursue radiologic diagnostics of her spine because she reported

her back pain got better. Tr. 605, 607. The record supports this finding.[11] Tr. 390, 469, 856.

The ALJ discussed that despite Ms. Baca's complaints of anxiety and depression, she reported to

psychological consultant Thomas P. Dhanens, Ph.D., on February 12, 2015,[12] that her

---

[11] The record demonstrates that Ms. Baca complained only once during the relevant period of time of arthralgias and back pain – on December 21, 2012, to Dr. Hannagan. Tr. 589. That said, Dr. Hannagan's physical exam on that date demonstrated normal range of motion without pain (neck), and normal range of motion with no edema (musculoskeletal). On July 26, 2011, January 4, 2012, and May 25, 2012, Ms. Baca denied any arthralgias, myalgias, or back pain, and on physical exam Dr. Hannagan noted normal range of motion without tenderness or pain (neck), normal range of motion with no edema and no tenderness (musculoskeletal), and normal range of motion and no pain (lumbar back). Tr. 317-18, 326, 338.

At step two, the ALJ determined that the "medical evidence of record does not support fibromyalgia, back pain, left lower extremity pain, small hiatal hernia, knee sprain, conjunctival hemorrhage, cholelithiasis, or gastroesophageal reflux disease as medically determinable impairments. . . . The only reference to back pain in the record is subjective complaints of pain by the claimant, with no supporting objective evidence." Tr. 602. The ALJ also discussed at step two that "[k]nee pain, conjunctival hemorrhage, cholelithiasis, adjustment disorder, and GERD were also only noted in the record after the date last insured." *Id.* Ms. Baca has not disputed the ALJ's step two findings.

[12] On February 12, 2015, Thomas P. Dhanens, Ph.D., performed a mental status exam on Ms. Baca. Tr. 581-84. Dr. Dhanens noted, *inter alia*, that Ms. Baca did not show significant difficulty on mental status tasks "although there were a few minor slips." Tr. 583. He did not see any evidence of dementia. He noted Ms. Baca answered mental status questions overall at an average level, not perfect, but with occasional minor lapses. *Id.* He indicates that "[p]robably a diagnosis of mild Dysthymia is warranted, given the presentation and history she described. But her primary vocational allegation is related to cognition, not depression." *Id.* Dr. Dhanens diagnosed mild dysthymia, and found it credible that she would have difficulty learning new technical or clerical skills at an efficient competitive level. *Id.* He assessed that cognitively Ms. Baca was capable of performing simple routine work activities that would draw upon her current skills, require little training, and not demand a high level of

anxiety/depressive tendencies did not prevent her from working in the past.  Tr. 606.  The ALJ

also noted that Dr. Dhanens diagnosed only mild chronic anxiety and depressive tendencies even

in the absence of psychotropic medications.  Tr. 606.    The record supports this finding.  Tr. 583.

The ALJ discussed that although Ms. Baca complained of insomnia, she reported to medical

consultant John R. Vigil, M.D., on October 6, 2014,[13] that she gets 6-8 hours of sleep, which she

described it as not restful, and that she attributed her fatigue with insomnia.[14]  Tr. 607.  The

record supports this finding. Tr. 571.  The ALJ discussed that Ms. Baca testified that she has

problems concentrating or learning anything new, but that she paid all the bills for the household

and read books to assist her in budgeting.[15]  Tr. 606.  The record supports this finding.  Tr. 644.

The ALJ also discussed that Dr. Hannagan routinely indicated on physical exam that Ms. Baca

had normal cognition and memory, and that Dr. Hannagan had a difficult time finding a

connection between Ms. Baca's alleged memory complaints and her cirrhosis.  Tr. 607.  The

record supports this finding.  Tr. 318, 326, 338, 467, 470.  Finally, the ALJ discussed that

Ms. Baca's physical impairments did not limit her capacity to do many activities of daily living

---

concentration or multitasking.  *Id.*  The ALJ accorded Dr. Dhanens' opinion significant weight.  Tr. 609.  Ms. Baca does not dispute the ALJ's evaluation or weighing of Dr. Dhanens' opinion.

[13] On October 6, 2014, John R. Vigil, M.D., performed an independent medical evaluation on Ms. Baca at the request of her attorney Michael Armstrong.  Tr. 570-78.  Following his exam, Dr. Vigil concluded that "within a reasonable medical probability that this patient has moderately severe functional limitations and is moderately limited in both vocational and avocational activities secondary to her chronic pain and co-morbid medical and psychiatric conditions."  Tr. 574.  He further opined that "Ms. Baca's disabilities, including her chronic pain, fatigue, and other physical conditions preclude her from performing anything more than sedentary to light work since at least 2007."  Id.  Dr. Vigil also assessed a number of limitations in Ms. Baca's ability to do work-related mental functions based on chronic fatigue and fibromyalgia.  Tr. 576-78.  The ALJ accorded Dr. Vigil's opinion little weight as unsupported by the record.  Tr. 608.  Ms. Baca does not dispute the ALJ's evaluation or weighing of Dr. Vigil's opinion.

[14] On January 4, 2012, Ms. Baca reported to Dr. Hannagan that she believed her fatigue was due to her busy lifestyle.  Tr. 324.

[15] The ALJ also noted at step two, that Ms. Baca was able to understand the rationale behind her medical procedures, and did not have any serious problems with sequencing tasks.  Tr. 603.  The record supports these findings.  Tr. 324, 448, 582.

during the relevant period of time, thereby undermining her statements regarding the limiting

effects of her alleged symptom of fatigue.  Tr. 607.  The record supports this finding.  Tr.  214-

21.  Thus, the ALJ provided explanations supported by substantial evidence for determining that

Ms. Baca's statements regarding the limiting effects of her fatigue were inconsistent with the

objective medical evidence and the other evidence and were therefore less likely to reduce her

capacity to perform work-related activities.  *See* SSR 16-3p, 2017 WL 5180304, at *10.

Based on the foregoing, the Court finds that the ALJ properly evaluated Ms. Baca's

statements regarding the intensity, persistence and limiting effect of her symptom of fatigue

pursuant to the relevant regulations and Tenth Circuit case law, and that her findings are

supported by substantial evidence.  *Poppa*, 569 F.3d at 1171; *see Kepler*, 68 F.3d at 391 ("[W]e

will not upset credibility determinations when supported by substantial evidence.").  Because the

ALJ applied the correct legal standards in evaluating the evidence, and substantial evidence

supports her determination, the Court will not disturb the ALJ's findings in this regard.

### 2.    *Wells v. Colvin*

Ms. Baca also argues that, after determining at step two that Ms. Baca had numerous

medically determinable severe and nonsevere impairments that caused fatigue, the ALJ was

required to consider at step four the combined effect of her "fatigue-inducing" impairments in

determining that Ms. Baca could work at a light exertional capacity that requires "a good deal of

walking or standing."  Doc. 21 at 12.  Ms. Baca contends, however, that it is not apparent how

the ALJ factored all of Ms. Baca's "fatigue-inducing" impairments into the RFC at step four,

similar to the circumstances the Tenth Circuit addressed in *Wells v. Colvin*, 727 F.3d 1061, 1068-

69 (10th Cir. 2013).  Doc. 21 at 10.

In *Wells*, the Court held that, in light of the Commissioner's regulations "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five." *Wells*, 727 F.3d at 1068-69.  At step two in *Wells*, "the ALJ stated that [the] findings [of mild limitations] do not result in further limitations in work-related functions in the RFC assessment below," and then reiterated that the mental impairments were nonsevere.  *Id.* (brackets and internal quotation marks omitted).  Concerned that this language implied that the ALJ "may have relied on his step-two findings to conclude that [the claimant] had no limitation based on her mental impairments," *Wells* held that such analysis "was inadequate under the regulations and the Commissioner's procedures."  *Id.*  "[T]o the extent the ALJ relied on his findings of non-severity as a substitute for adequate RFC analysis, the Commissioner's regulations demand a more thorough analysis."  *Id.* at 1071.  *Wells* further discussed the requirements for analysis of mental impairments at step four, noting that the step-four RFC assessment is more detailed than the step-two severity assessment and listing various functions that may be relevant to a mental RFC assessment.  *See id.* at 1068-69.

In *Wells*, however, the ALJ, in addition to his statement about the RFC at step two, separately discussed the claimant's nonsevere mental impairments in his RFC analysis at step four.  *See id.* at 1068-69.  The Tenth Circuit stated that "[h]is discussion, though far from systematic, may have been adequate to fulfill his duty at step four to determine [the claimant's] mental RFC."  *Id.* at 1065; *see also id*. at 1068-69.  Ultimately the problem in *Wells* was that the ALJ's step four discussion related to the claimant's nonsevere mental impairments was not supported by substantial evidence.  *Alvey v. Colvin*, 536 F. Appx. 792, 794 (10th Cir. 2013) (citing *Wells*, 727 F.3d at 1065-69).

Here, at step two, the ALJ considered the medical severity of Ms. Baca's alleged impairments. Tr. 601-02. An ALJ's step two findings require only a "de minimis" showing of impairment. *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (stating that if a claimant is able to show that his impairment would have more than a minimal effect on his ability to do basic work activity he has made a *de minimus* showing). The ALJ determined, *inter alia,* that Ms. Baca's alleged chronic fatigue was severe.[16] Tr. 601. As for the ALJ's determination that certain of Ms. Baca's alleged impairments were nonsevere, the ALJ explained the basis for her determination. For example, as for Ms. Baca's osteopenia, the ALJ discussed that Ms. Baca was advised to supplement her diet with calcium and vitamin D, and encouraged to do weight bearing exercises.[17] Tr. 602. The ALJ noted that this was the only reference to a Vitamin D deficiency prior to the date of last insured. *Id.* The record supports this finding. Tr. 284. The ALJ also discussed that Ms. Baca's iron deficiency anemia in June 2012 was treated with iron supplements. *Id.* The record supports this findings.[18] Tr. 370, 389. Elsewhere in his determination, the ALJ noted that Ms. Baca's thrombocytopenia was considered "mild asymptomatic," and that her hepatitis C was considered "successfully treated." Tr. 607. The record supports this finding. Tr. 370. The ALJ also noted that Ms. Baca stated that her cirrhosis was well managed with dietary modifications.[19] *Id.* Then,

---

[16] The ALJ specifically noted at step two that she evaluated Ms. Baca's chronic fatigue under SSR 14-1p and found that it did not medically equal any physical listing. Tr. 603. The ALJ also explained elsewhere in the determination that "[r]egarding the claimant's chronic fatigue, she started to complain about fatigue in 2012 (4F/30). She associates her fatigue with her insomnia (9F/3)." Tr. 607.

[17] The record also supports that Ms. Baca's osteopenia diagnosis was considered "entirely consistent with aging," and required no bone related pharmacologic therapy. Tr. 184. Additionally, on February 3, 2013, Dr. Hannagan informed Ms. Baca that recent laboratory studies indicated, *inter alia,* that her Vitamin D was normal. Tr. 591.

[18] Dr. Juhee Sidhu noted on April 3, 2013, that Ms. Baca's iron deficiency anemia was resolved. Tr. 803.

[19] The record indicates that Ms. Baca was managing her gallbladder disease with diet during the relevant period of time and that she was stable on her diet regimen. Tr. 469, 805. The record also indicates that Ms. Baca's liver function tests were not elevated and normal during the relevant period of time. Tr. 591, 798.

after identifying Ms. Baca's severe, nonsevere, and non-medically determinable impairments, the ALJ explicitly stated that "I have considered all of the alleged impairments in formulating the residual functional capacity."  Tr. 602.

At step four, the ALJ then stated that she had considered the entire record in making her RFC.  Tr. 605.  While the Court agrees that the ALJ's discussion that followed regarding Ms. Baca's nonsevere impairments could have been more systematic, the Court nonetheless finds that it is adequate to fulfill her duty to consider Ms. Baca's nonsevere impairments, and that the ALJ's RFC findings are supported by substantial evidence.  In making her determination that Ms. Baca was capable of performing light exertional work, the ALJ considered the medical opinion evidence as she was required to do.  Tr. 608-09; *see* 20 C.F.R. § 404.1527(b); SSR 96-8p, 1996 WL 374184, at *7.  In so doing, the ALJ accorded significant weight to the opinion of State agency medical consultant Leah Holly, D.O., who assessed that Ms. Baca could perform light exertional capacity work with certain postural limitations.  Tr. 608.  The ALJ explained that

> [h]er opinion that the claimant is capable of light work is consistent with the record, including the claimant's activities of daily living, her testimony, and the medical evidence of record.  Specifically, the record demonstrates that the claimant remained active prior to her date last insured, able to perform such activities as housekeeping, driving, taking grandchildren to the zoo, caring for pets, and meal preparation.  However, I have assessed the claimant with additional postural and environmental limitations based on her chronic fatigue, and musculoskeletal pain.

Tr. 608.  Dr. Holly's narrative in support of her assessment, in turn, explicitly addresses certain of Ms. Baca's nonsevere impairments.  She states as follows:

> Apparently dx with Hepatitis C 2/07 w/Viral load undetectable.  2/18/08 Has started tx for hep C with good response.  1/24/11 mild thrombocytopenia of greater than 50,000 noted.  She was hospitalized 7/18/12-7/21/12 with increasing fatigue and palpitations/heart pounding with minimal exertion, acute on chronic anemia, iron deficiency, and positive guaiac exam c/w GI bleed.  BP 105/49; tachycardia at 103.  EGD showed moderate distal esophageal varices secondary to

liver cirrhosis d/t chronic hep c.  No evidence of active bleeding at time of EGD but erythema at the esophagogastric junction noted.  Anemia secondary to GI bleed, s/p packed red blood cell transfusion.  Had a transfusion reaction during night but cleared and received addtl units of packed red cells.  CT angiograph showed minimal ascites in abd and pelvis.  Esophageal banding was attempted but not completed because of hematoma formation above the initial banding site.  10/10/12 Cataract surgery f/u; no complications  VA 20/25 O, 20/20 OS.  9/412 BP 102/59.  Was started on proton inhibitors as well as beta blockers to decrease portal hypertension.  Tolerating iron therapy well.  8/12 ADLS functional: no difficulty with personal care, does cleaning and laundry.  Due to progressive and chronic nature of cl's condition, it is reasonable to assess a medical onset some 3 mos. prior to hospitalization, on 4/1/12.  Prior to that date, the evidence is insufficient to rate.

Tr. 107.

The ALJ also accorded significant weight to State agency medical consultant Karen Schnute, M.D.'s opinion.  Tr. 608.  Dr. Schnute reviewed the medical record evidence at reconsideration.  The ALJ explained that

> [h]er opinion that the claimant is capable of light work is consistent with the record, including the claimant's activities of daily living, her testimony, and the medical evidence of record as described above.  I do find Dr. Holly's opinion slightly more persuasive in that she assessed additional postural limitations that appear to be supported by the record.

Tr. 608.  Dr. Schnute's narrative repeated much of Dr. Holly's, but she provided her reconsideration analysis as follows:

> 4/24/13 Updated medical evidence shows normal labs, except cholesterol and LDL high with protective HDL, FBS slightly elevated.  Physical examination is normal in all extremities, no cervical adenopathy; abdominal is soft, normal appearance, she exhibits no distension and no mass or hepatosplenomegaly, no tenderness, no CVA.  Claimant is alert and oriented to person, place, and time and has normal reflexes.  Assessment shows: Hypertension, Hypothyroidism, Hepatitis C, Thrombocytopenia, Vitamin D Deficiency, Calculus of gallbladder within mention of cholecystitis or obstruction, and Hyperlipidemia.  I have reviewed all medical evidence in file, and assessment of 10/04/12, is affirmed as written.

Tr. 116.

The only other medical opinion evidence in the record that addressed Ms. Baca's ability to do work-related physical activities is Dr. Vigil's opinion, whose opinion the ALJ accorded little weight as unsupported by the record.  Tr. 608-09.

Ms. Baca does not dispute the ALJ's evaluation or weighing of the medical opinion evidence.  Moreover, the ALJ's evaluation and weighing of the medical opinion evidence demonstrates that she considered Ms. Baca's nonsevere impairments in determining that Ms. Baca could perform light exertional work.

Lastly, Ms. Baca repeatedly emphasizes that the ALJ assessed her chronic fatigue as *severe*, thereby suggesting that greater limitations were automatically required, particularly when viewed in combination with her "fatigue-inducing" nonsevere impairments.  However, as previously noted, an ALJ's findings at step two require only a "*de minimis*" showing of impairment.  *Hinkle,* 132 F.3d at 1352; *Williams,* 844 F.2d at 751.  When a claimant's impairments do not meet or equal in severity the requirements of any impairments in the Listings, as is the case here, the ALJ uses her step two findings as a basis for her step four and five findings.  SSR 96-8p, 1996 WL 374184, at *2 (instructing that an adjudicator must consider only limitations and restrictions attributable to medically determinable impairments).  Thus, whether an identified impairment causes physical or mental limitations or restrictions that affect a claimant's capacity to do work-related physical and mental activities at steps four and five is an entirely separate and different analysis.

  Significantly, Ms. Baca has not pointed to any medical evidence or medical opinion evidence, and the Court has found none in its meticulous review of the record, to demonstrate that her chronic fatigue in combination with her "fatigue-inducing" nonsevere impairments supported greater physical restrictions than assessed.  *See generally, Alvey*, 536 F. App'x at 794-

95 (finding that the ALJ's failure to conduct a more particularized assessment of mental functions at step four was harmless error where there was no substantial evidence that would allow a reasonable administrative factfinder to include any mental limits in the RFC).  Instead, Ms. Baca argues that "[i]t is not immediately apparent" how all of Ms. Baca's medically determinable impairments that produce fatigue were factored into the ALJ's RFC analysis.  As discussed herein, however, the ALJ discounted Ms. Baca's statements regarding the intensity, persistence and limiting effects of her symptoms of fatigue and her findings are supported by substantial evidence.  As such, it is reasonable that the ALJ determined that Ms. Baca's fatigue was less likely to reduce her capacity to perform work-related activities.  *See* SSR 16-3p, 2017 WL 5180304, at *10.  Additionally, the ALJ, at step four, evaluated and weighed the medical opinion evidence which sufficiently considered Ms. Baca's nonsevere impairments in determining she could perform light exertional work during the relevant period of time.

For the foregoing reasons, the Court finds that the ALJ adequately satisfied her duty at step four in considering Ms. Baca's nonsevere impairments, and that the ALJ's RFC findings are supported by substantial evidence.  As such, there is no reversible error as to this issue.

### IV.  <u>Conclusion</u>

For the reasons stated above, Ms. Baca's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 21) is **DENIED.**

_____

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge,**
**Presiding by Consent**